IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DEBORAH CLARIDY,

*Plaintiff*,

v.

Civil Action No. ELH-13-02600

JOHN ANDERSON,

*Defendant*.

**MEMORANDUM OPINION**

Deborah Claridy, plaintiff, a former Deputy Sheriff and Lieutenant with the Baltimore

City Sheriff's Office, filed suit against Baltimore City Sheriff John Anderson, in his individual

capacity, pursuant to 42 U.S.C. § 1983.[1]  Plaintiff claims that Anderson violated her rights under

the First Amendment when he disciplined her and changed her job duties in retaliation for her

electoral campaign against him in 2010, for the Office of Sheriff.  ECF 1.[2]  Claridy filed two

exhibits with her Complaint.  Exhibit A includes a letter dated May 24, 2011, notifying plaintiff

of her suspension from duty, with pay.  ECF 1-2 at 2.  In addition, it includes the seventeen

charges filed by the Sheriff's Office against plaintiff on May 23, 2011, for alleged violation of

the Sheriff's Office "rules, policy, and procedures and/or under State and Local statutes" (ECF 1-

---

[1] Claridy was represented by counsel when she filed her Complaint in September 2013.
*See* ECF 1 at 11.  But, she has been self-represented since May 2014.  At that time, her lawyer
sought to withdraw as counsel, ECF 13, because he was placed on "Inactive Status" pursuant to
an Order of the Maryland Court of Appeals.  *See also* ECF 14 (Order granting motion to
withdraw).

[2] When Claridy filed her Complaint, she was still employed by the Sheriff's Office.  ECF
1 at 1.  However, briefing on the pending motion reveals that Claridy has since separated from
the Sheriff's Office.  *See* ECF 17 (defendant); ECF 23 (plaintiff).

2 at 2-19, "First Charges").    Exhibit B includes six charges re-filed against plaintiff on September 6, 2011 (ECF 1-3, "Second Charges").

Defendant has moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6) (ECF 16, "Motion"), supported by a memorandum (ECF 17, "Memo"), and two exhibits: a copy of a decision from the Circuit Court for Baltimore City, ECF 17-1, upholding Claridy's termination from the Sheriff's Office on October 29, 2013, and a copy of a job description for the position of "Deputy Sheriff Lieutenant."    ECF 17-2.    Plaintiff opposes the Motion.    *See* ECF 23 ("Opposition").  Defendant did not reply, and the time to do so has now passed.  *See* Local Rule 105.2.   No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.

As to plaintiff's claims of violations of her right to free speech, defendant is entitled to qualified immunity, which bars plaintiff's claims for monetary damages.  Additionally, some of plaintiff's claims for injunctive relief have been rendered moot by her subsequent termination, on grounds unrelated to this case.    *See* ECF 17-1 (State court opinion affirming Claridy's termination).   But, plaintiff's request for injunctive relief as to the inclusion of the First and Second Charges in her personnel file is neither moot nor barred by defendant's qualified immunity.  Therefore, for the reasons that follow, I will grant the Motion, in part, and deny it, in part.

## Factual Background[3]

Sheriff John Anderson is an elected official in the City of Baltimore and the head of the

---

[3] Given the posture of the case, I have assumed the truth of the facts set forth in the Complaint.

Sheriff's Office in Baltimore City.  ECF 1 ¶ 3.  He has served as Sheriff since January 1989.[4]

Claridy began her employment as a "Deputy Sheriff" in 1990.  ECF 1 ¶ 6.  She was promoted to Sergeant in 2001, and to Lieutenant in 2003.  *Id.* ¶¶ 7, 8.  She alleges that by 2010 she "primarily handled administrative functions in the Sheriff's Office including payroll, accounting, leave, budget and fiscal and related duties." *Id.* ¶ 9.  "She also performed duties as a law enforcement officer including courtroom security, service of process and making arrests." *Id.*  According to plaintiff, she was "the highest ranking female sworn deputy sheriff," "supervised an administrative staff," and reported to the "Chief Deputy Sheriff," who "is the second in command of the office." *Id.*

In January 2010, Claridy met with Anderson and "informed him that she intended to run in the [September] 2010 Primary Election in the City of Baltimore for the office of Sheriff." *Id.* ¶ 10; *see also id.* ¶ 14.  "Between January 2010 and July 2010, Claridy conducted her campaign on a part-time basis," while still working at the Sheriff's Office.  *Id.* ¶ 12.  "On her own time, and after work hours, Claridy began raising money for her campaign, organizing supporters and volunteers, going to campaign related events and speaking out at those events and to the media on matters and issues of public concern … ." *Id.* ¶ 11.  Claridy states that "[d]uring that period," "she continued to perform her … duties as a sworn deputy sheriff," continued "to have her full police powers," and no "disciplinary charges were filed against her." *Id.*  She notes that "Anderson as well as several other candidates for the Office of Sheriff also were campaigning, attending campaign events and speaking to the media during that period." *Id.*

---

[4] *See* Maryland State Archives, Maryland Manual On-Line, "John W. Anderson", http://msa.maryland.gov/msa/mdmanual/36loc/bcity/html/msa14118.html (Aug. 25, 2014).

In May 2010, "Claridy filed her certificate of candidacy…." *Id.* ¶ 13. "Prior to the deadline date for the filing or withdrawal of a certificate of candidacy in July 2010, Anderson … offered to promote" Claridy "to the rank of Major after the election if she dropped her candidacy for office." *Id.* ¶ 11. Claridy "declined the offer." *Id.*

Thereafter, Claridy "took leave" from the Sherriff's Office, beginning in July 2010, "and conducted her campaign on a full-time basis." *Id.* ¶ 14. She continued to "speak out … at campaign events and to the media," as did Anderson. *Id.* She also "continued to have her full police powers, and no disciplinary charges were filed against her during that period." *Id.*

Claridy does not specify any of the campaign events she attended or media appearances she made during her campaign. But, she alleges generally that she "spoke out" on "the need for the Sheriff" to do the following things: "recruit and hire more minorities and women as sworn deputy sheriffs who have law enforcement responsibilities"; "promote more women … to supervisory and management positions"; "expand the capacity of the office to become the principal intake agency for domestic violence complaints" in Baltimore; "increase the number of sworn deputies for courtroom security work"; "seek increased funding in order to expand training so that sworn deputies could enhance their skills and assist law enforcement officials from other agencies … throughout the City of Baltimore"; "seek legislation to improve the foreclosure process for homeowners … so that the office could provide more information to homeowners" when it enforces foreclosure orders; "upgrade and improve the technology used for courthouse security"; and "reduce overtime expenditures." *Id.* ¶ 11.

"Anderson won the Primary Election for the Office Sheriff in September 2010. Claridy came in second place." *Id.* ¶ 15. After the primary election, Claridy "returned to full time work"

in the Sheriff's Office.  But, "on or about September 23, 2010, … Anderson removed Claridy from handling administrative duties, and assigned her to do what was called 'daily courtroom checks.'"  *Id*. ¶ 16.  Claridy states that "no such assignment ever existed in the Sheriff's Office" before Claridy's assignment.  *Id*.  In particular, Claridy "was assigned to go to each courtroom each day and make a report of what she observed."  *Id*.  However, "[s]he was not allowed to speak or to supervise any Sheriff's Office personnel in the courtrooms," or to "exercise her law enforcement powers in the courtrooms."  *Id*.  She had no staff, job description, orientation or training for the assignment.  *Id*.  According to Claridy, she "performed her new assignment diligently for 8 months from September 23, 2011 to May 24, 2011, and filed her reports," without receiving any oversight, direction, feedback, or evaluation.  *Id*. ¶ 17.

"On May 24, 2011, Anderson directed that Claridy be served with 17 administrative disciplinary charges … and suspended from duty," with pay, pending an administrative hearing. *Id*. ¶ 18; ECF 1-2 at 2.  Her "police powers also were suspended."  ECF 1 ¶ 18.

The seventeen charges pertained to four specific instances of alleged misconduct.  *Id*. ¶ 18; *see also* First Charges, ECF 1-2.  Three of the specific instances, and eleven of the seventeen charges, related to Claridy's campaign speech.  The fourth instance related to performance of duties.

Charge numbers 1 through 5 repeat the following allegation, ECF 1-2 at 3-7:

It is alleged that on or about May 10, 2010, you filed as a candidate for Sheriff and thereafter allowed yourself to be photographed in the Sheriff's Office Class A uniform, without the authorization of Sheriff John W. Anderson, however the photograph was placed on a flyer advertising your campaign for Sheriff and were [sic] distributed throughout the City of Baltimore.

Charge numbers 6 through 9 repeat the following allegation, ECF 1-2 at 8-11:

It is alleged that on or about August 6th and/or 29th, you appeared on a local radio show, acknowledged that you were a Lieutenant employed with the Baltimore City Sheriff's Office, and criticized the agency, the Sheriff and other deputies in the Sheriff's Office. You further made allegations of wrongdoing and corruption by the Sheriff and certain deputies that were without factual basis and were primarily, if not solely, to advance your campaign for Sheriff.

Charge numbers 10 and 11 repeat the following allegation, ECF 1-2 at 12-13:

It is alleged that during your campaign you created and maintained a website advertising and promoting your candidacy for the Sheriff of Baltimore City. The website identified you as a Lieutenant currently employed with the Baltimore City Sheriff's Office, and inappropriately criticized the agency, the Sheriff and other deputies in the Sheriff's Office. You further made allegations of wrongdoing and corruption by the Sheriff and certain deputies that were without factual basis and were primarily, if not solely, to advance your campaign for Sheriff.

Charge numbers 12 through 17 repeat one of two allegations: 1) that "on or about September 23, 2010," Claridy "failed to follow specific orders of the Department to make daily checks of all courtrooms … , and failed to follow the specific instructions" of a supervisor, and/or 2) that starting on September 23, 2010, and through December 29, 2010, Claridy "failed to submit complete sets of daily reports from the courtroom checks … as required per instructions" from a supervisor. ECF 1-2 at 14-19.

In particular, with regard to the campaign speech charges, Claridy was variously charged with violating rules, policy, and procedures of the Baltimore City Sheriff's Office, as well as provisions of the "General Orders Manual and/or State and Local statutes," ECF 1-2 at 3-13. In general, the relevant provisions are as follows:[5]

Standards of Conduct, Section 2.2.2, Standards of Conduct in General:

Subsection M: Public Criticism

---

[5] The format of the charge descriptions has been altered, and the order of appearance has been changed, to avoid redundancy and for clarity and ease of reference.

Members of this agency shall refrain from engaging in public criticism of this agency, its policies, and/or any of its members, verbally, electronically or in writing; [ECF 1-2 at 8]

Subsection O: Abuse of Position

No member of this agency shall be permitted to use any name, photograph or official title which links the member to this agency, for the purpose of endorsing, advertising, or otherwise supporting any service, product, or cause without specific prior approval from the Sheriff of Baltimore City. [*Id.* at 3].

Standards of Conduct, Section 2.2.4, Conduct Unbecoming:

Subsection A: General

1) No employee of the Baltimore City Sheriff's Office will commit any act which constitutes conduct unbecoming an employee of this Office. [ECF 1-2 at 9].

Subsection B: Misconduct

Any breach of the peace, neglect of duty, or other misconduct on the part of any employee either within or outside the State of Maryland, which tends to undermine the good order, efficiency or discipline of the Office, even though these offenses may not be specifically set forth, shall be considered conduct unbecoming. [*Id.* at 10].

Standards of Conduct, Section 2.2.7, Political Activity, Subsection B: Political Activities Which are Prohibited:

2) No member of the Baltimore City Sheriff's Office shall be permitted to use his/or [sic] official position as a member of this agency to publicly support any particular political party or candidate for public office. [ECF 1-2 at 12].

3) Members of the Baltimore City Sheriff's Office shall not:

a) Allow themselves to be identified in campaign literature as members of this agency; [*Id.* at 4]

b) Allow themselves to be photographed in uniform for the purpose of endorsing a candidate for public office or a political movement; [*Id.* at 5]

- 7 -

4) Use of any equipment or materials belonging to this agency for the support of any candidate for public office, any political movement, or in the furtherance of any cause or ideology is specifically prohibited.  [*Id*. at 7].

State Ethics Laws Title 15, Subtitle 5, Conflicts of Interest, Part 1, General Provisions, Section 15-506: Use of Prestige of Office

In general—An official or employee may not intentionally use the prestige of office or public position for that official's or employee's private gain or that of another.  [ECF 1-2 at 6, 11, 13].

Specifically, with regard to Claridy's alleged use of a picture of herself in uniform, Claridy was charged with using "any name, photograph or official title which links the member to this agency, for the purpose of endorsing, advertising, or otherwise supporting any service, product or cause without specific prior approval from the Sheriff …", in violation of the Standards of Conduct in General, ECF 1-2 at 3 (Charge 1); allowing herself to be identified in campaign literature as a member of the agency, in violation of Standards of Conduct relating to "Political Activity", *id*. at 4 (Charge 2); allowing herself to be photographed in uniform for the purpose of endorsing a candidate, in violation of the same, *id.* at 5 (Charge 3); use of equipment or materials belonging to the agency in support of a candidate, in violation of the same, *id*. at 7 (Charge 5); and violation of "State Ethics Laws Title 15," for intentionally using the prestige of the office for private gain.  *Id*. at 6 (Charge 4).

With regard to Claridy's comments on "a local radio show," Claridy was charged with engaging in public criticism of the agency, in violation of the Standards of Conduct in General, *id.* at 8 (Charge 6); committing an act which constitutes conduct unbecoming, in violation of Standards of Conduct relating to "Conduct Unbecoming," *id.* at 9 (Charge 7); breach of the peace, neglect of duty, or other misconduct which tends to undermine the good order, efficiency

or discipline of the Office, in violation of the same, *id.* at 10 (Charge 8); and violation of "State Ethics Laws Title 15." *Id.* at 11 (Charge 9).

With respect to Claridy's campaign website, Claridy was charged with using her official position to publicly support a candidate for public office, in violation of Standards of Conduct relating to "Political Activity", *id.* at 12 (Charge 10), and violation of "State Ethics Laws Title 15." *Id.* at 13 (Charge 11).

With respect to the other alleged performances issues, Claridy was charged with failing to report for duty at the time and place required by her duties, on September 23, 2010, in violation of Standards of Conduct relating to "On-Duty Conduct", *id.* at 14 (Charge 12); failure to submit complete sets of required reports by the deadline set by her supervisor, "on or about September 23, 2010 through December 29, 2010," in violation of the same, *id.* at 15 (Charge 13); committing conduct unbecoming an employee of the Office, for the same conduct as in Charge 13, in violation of Standards of Conduct relating to "Conduct Unbecoming", *id.* at 16 (Charge 14); unwillingness or inability to perform assigned tasks for the same conduct as in Charge 13, in violation of General Standards of Conduct, *id.* at 17 (Charge 15); disobeying lawful orders issued by a supervisor, for failing to follow the specific orders of a supervisor on September 23, 2010, in violation of Standards of Conduct relating to "Orders" *id.* at 18 (Charge 16); and failure to file complete sets of required reports, in violation of a Standard of Conduct relating to "On-Duty Conduct" that states "[a]ll required reports shall be completed, legible, truthful and written in accordance with agency standards." *Id.* at 19 (Charge 17).

Claridy "appeared before a trial board on the charges" on August 30, 2011. *Id.* ¶ 19. "The charges were dismissed," *id.*, and she was scheduled to return to work on September 6,

2011.  *Id*. ¶ 20.  But, "Anderson directed that Claridy be recharged with all charges except the charges related to Claridy's campaign."  *Id*.  Claridy was served with new charges on September 6, 2011, and her suspension from duty and suspension of "police powers" was continued.  *Id*. The new charges, *see* Second Charges, ECF 1-3, essentially restated charges 12 through 17 of the First Charges, although the time period in which they alleged that Claridy failed to file reports extended through May 23, 2011, rather than through December 29, 2010.  *See* ECF 1 ¶ 20; ECF 1-3.

"Eight months later, on or about March 8, 2012, Anderson directed that Claridy return to work."  ECF 1 ¶ 21.  Her "police powers," however, were to remain "suspended until the resolution of her Internal Affairs Case."  *Id*. ¶ 22 (internal citation omitted).  Claridy was given another new assignment, which "included tasks such as reading and responding to emails, handling routine paperwork normally handled by civilian clerks, checking the doors to the courthouses … [and] courtrooms, checking the hand sanitizers in the courthouses," and "checking the telephones to make sure that they were operational and going to the prisoner lock-up in the courthouses to count prisoners … ."  *Id*. ¶ 21.

At an unspecified time, Anderson "offered to dismiss all disciplinary charges pending against Claridy and to purge her personnel jacket of all related adverse information," if Claridy retired.  *Id*. ¶ 23.  But, Claridy "declined to do so."  *Id*.

The Complaint alleges that "nothing had been done … to resolve Claridy's case" since March 8, 2012.  *Id*. ¶ 24.  But, as indicated, the briefings on the Motion make clear that Claridy has since been terminated from the Sheriff's Office, for other reasons.  *See*, *e.g.*, ECF 17-1 (State

court decision).  It appears that the Second Charges did not play any role in Claridy's subsequent termination, *see id.*, and it is unclear what became of the Second Charges.

With respect to Claridy's termination on October 29, 2013, by the Sheriff's Office, defendant states in his Memo that "on April 16, 2013, Claridy was charged with various administrative offenses regarding her failure to report for duty on October 29 and 30, 2012," during a weather emergency (Hurricane Sandy), "as well as destruction of a sick leave slip on April 16, 2013." ECF 17 at 2; *see also* ECF 17-1.  Defendant has submitted a Memorandum and Order authored by Baltimore City Circuit Court Judge Pamela White, in which she upheld the termination.[6]  ECF 17-1.  In her Opposition, plaintiff does not dispute that she has been terminated by the Sheriff's Office.  Indeed, she asserts that she is "entitle[d]" to relief "for wrongful discharge in violation of public policy."  ECF 23 at 1.[7]

Claridy seeks both monetary and injunctive relief.  ECF 1 at 10-11.  She requests "a money judgment against Defendant in his personal capacity … in an amount not less than

_____

[6] Judge White's opinion reflects that a three member "Trial Board" conducted evidentiary hearings, pursuant to Md. Code, § 3-107 of the Public Safety Article ("P.S.").  Claridy was one of eight witnesses who testified at the hearing.  She was found guilty as to eight of ten charges. ECF 17-1 at 1-2.  *Id.*  Claridy then sought judicial review under P.S. § 3-109, pursuant to the Law Enforcement Officers' Bill of Rights ("LEOBR"), P.S. § 3-101 et seq.  *Id.* at 3.  In that context, Judge White upheld Claridy's termination from employment.

[7] Plaintiff's Complaint does not allege wrongful termination, or even allege the fact of her termination.  *See* ECF 1.  To the extent that plaintiff is attempting to amend her Complaint by arguing, in her Opposition, that she is entitled to "relief for tortious interference with contractual relations, for wrongful discharge in violation of public policy, and for civil conspiracy," ECF 23 at 1, I note that plaintiff cannot amend her Complaint via her Opposition, as "'it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'"  *Mylan Laboratories, Inc. v. Akzo*, 770 F. Supp. 1053, 1068 (D. Md. 1991) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984)), *aff'd*, 2 F.3d 56 (4th Cir. 1993); *see also Zachair Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (stating that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998).

$2,500,000.00." *Id.* at 10.   And, she seeks injunctions granting the following relief: "restoring Plaintiff to her full time duties as a sworn deputy sheriff; … restoring Plaintiff's police powers; … dismissing all disciplinary charges filed against Plaintiff covered by this suit; [and]… purging Plaintiff's personnel file of all information pertaining to the charges." *Id.* at 11.

### Standard of Review

Defendant has moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).   A defendant may test the adequacy of a complaint by way of a motion to dismiss under Rule 12(b)(6).   *See McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010).   A motion to dismiss pursuant to Rule 12(b)(6) constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."   Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).   Rule 8 provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."   The purpose of the rule is to provide the defendant with "fair notice" of the claim and the "grounds" for entitlement to relief.   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 n.3 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).   *Twombly*, 550 U.S. at 555.   Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."   *Johnson v. City of Shelby*, —— U.S. ——, 135 S. Ct. 346, 346 (2014) (per curiam). But, Rule 8 demands more than bald accusations or mere speculation.   *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).   To satisfy the

minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if ... [the] actual proof of those facts is improbable and ... recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556.  In other words, the complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Id.* at 570; *see Iqbal*, 556 U.S. at 684; *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 768 (4th Cir. 2011).

In reviewing a Rule 12(b)(6) a motion, a court "'must accept as true all of the factual allegations contained in the complaint,'" and must "'draw all reasonable inferences [from those facts] in favor of the plaintiff.'" *E.I. du Pont de Nemours & Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir.), *cert. denied*, ⎯⎯ U.S. ⎯⎯, 132 S. Ct. 402 (2011); *Monroe v. City of Charlottesville*, 579 F.3d 380, 385–86 (4th Cir. 2009), *cert. denied*, 559 U.S. 991 (2010).  However, a complaint that provides no more than "labels and conclusions," or "a formulaic recitation of the elements of a cause of action," is insufficient.  *Twombly*, 550 U.S. at 555.  Moreover, the court is not required to accept legal conclusions drawn from the facts.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Monroe*, 579 F.3d at 385-86.

A Rule 12(b)(6) motion will be granted if the "well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct."  *Iqbal*, 556 U.S. at 679 (citation omitted). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought.  *A Society Without A Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011),

*cert. denied*, —— U.S. ——, 132 S. Ct. 1960 (2012).   "Dismissal is appropriate if the law simply affords no relief."   *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Reg. Sys., Inc.*, 680 F.3d 1194, 1201-02 (10th Cir. 2011).

Typically, a motion asserting failure to state a claim "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses," *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (quotation marks omitted), unless such a defense can be resolved on the basis of the facts alleged in the complaint.   *See Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc).   "This principle only applies, however, if all facts necessary to the affirmative defense 'clearly appear [ ] on the face of the complaint,'" or in other documents that are proper subjects of consideration under Rule 12(b)(6).   *Id.* (quoting *Richmond, Fredericksburg & Potomac R.R. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993)) (emphasis in *Goodman*).

Generally, a court's consideration of the adequacy of the allegations in a suit is confined to facts alleged in the operative pleading.   Usually, a court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein."   *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger v. U.S. Airways, Inc.*, 510 F.3d 442, 450 (4th Cir. 2007).   But, a court may properly consider documents "attached or incorporated into the complaint," as well as documents attached to the defendant's motion, "so long as they are integral to the complaint and authentic."   *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009); *see also U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448.   To be "integral," a

document must be one "that by its 'very existence, *and not the mere information it contains,* gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original); *see also New Beckley Mining Corp. v. UMWA*, 18 F.3d 1161, 1164 (4th Cir. 1994) (holding district court did not err in relying on document that plaintiff referred to in its complaint to justify cause of action).

### Discussion

### A.      Free Speech

The First Amendment to the United States Constitution provides:  "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

"'Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints.'"  *Am. Civil Liberties Union of N. Carolina v. Tata*, 742 F.3d 563, 565-66 (4th Cir. 2014) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010)).  Accordingly, governmental "[r]estrictions on speech based on its content are 'presumptively invalid' and subject to strict scrutiny."  *Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) (quoting *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992)). The Free Speech Clause is made applicable to the States via the Fourteenth Amendment.  *Gitlow v. New York*, 268 U.S. 652 (1925).

Moreover, the Constitution does not permit the government to do indirectly what it cannot do directly.  *See*, *e.g.*, *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 77-78 (1990)

("What the First Amendment precludes the government from commanding directly, it also precludes the government from accomplishing indirectly."). Consequently, the right of free speech, as guaranteed by the First Amendment, "includes not only the affirmative right to speak, but also the right to be free from retaliation by a public official for the exercise of that right." *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 685 (4th Cir. 2000). "Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." *Am. Civil Liberties Union of Md., Inc. v. Wicomico Cnty.*, 999 F.2d 780, 785 (4th Cir. 1993).

A plaintiff seeking to recover on a First Amendment retaliation claim must prove the following: "(1) she engaged in protected First Amendment activity, (2) the defendants took some action that adversely affected her First Amendment rights, and (3) there was a causal relationship between her protected activity and the defendants' conduct." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005).

A distinct body of precedent has developed addressing speech-retaliation claims in the employment context. *See*, *e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 422 (2006) (stating that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline"); *Connick v. Myers*, 461 U.S. 138, 142 (1983) (concluding that "when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's

behavior"); *Pickering v. Bd. of Ed. of Township High School Dist. 205*, 391 U.S. 563, 568 (1968) (stating that school board could not fire plaintiff, a teacher, for writing and publishing in a newspaper a letter critical of the school board's "handling of … bond issue proposals and its subsequent allocation of financial resources," because the school board's "interest … in limiting teachers' opportunities to contribute to public debate is not significantly greater than its interest in limiting a similar contribution by any member of the general public").

To be sure, "government employees do not lose their constitutional rights at work." *Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 560 (4th Cir. 2011) (citing *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004)). Indeed, the Supreme Court has said that "speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge of matters of public concern through their employment." *Lane v. Franks*, ––– U.S. –––, 134 S. Ct. 2369, 2379 (2014) (citing *Pickering*, 391 U.S at 572); *see also Pickering*, 391 U.S. at 572 ("Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operations of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal."). Nevertheless, "the government may impose certain restraints on its employees' speech and take action against them that would be unconstitutional if applied to the general public." *Adams*, 640 F.3d at 560.

In *Durham v. Jones*, 737 F.3d 291, 299 (4th Cir. 2013) (quoting *Brooks v. Arthur*, 685 F.3d 367, 371 (4th Cir. 2012) (internal citations and quotation marks omitted)), the Fourth Circuit set out a three-part test specific to speech retaliation claims by public employees:

> "First, we consider whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest.

Second, even if the employee spoke upon a matter of public concern, we must determine whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in managing the working environment.  And finally, if the employee's claim satisfies both of these legal criteria, the court turns to the factual question of whether the employee's speech was a substantial factor in the employee's termination decision."

As a threshold matter, a court must determine "whether the [public] employee spoke as a citizen on a matter of public concern." *Garcetti*, 547 U.S. at 418; *see also Borough of Duryea v. Guarnieri*, 564 U.S. ——, 131 S. Ct. 2488, 2493 (2011) ("When a public employee sues a government employer under the First Amendment's Speech Clause, the employee must show that he or she spoke as a citizen on a matter of public concern."); *Connick*, 461 U.S. at 147 (same).  "The public concern test was developed to protect . . . substantial government interests" in the management of its "internal affairs." *Guarnieri*, 131 S. Ct. at 3497.

"If an employee does not speak as a citizen, or does not address a matter of public concern, 'a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior.'" *Guarnieri*, 131 S. Ct. at 2493 (quoting *Connick*, 461 U.S. at 147).  Put another way, if an employee does not speak as a citizen on a matter of public concern, then "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." *Garcetti*, 547 U.S. at 418.

Whether the speech relates to a matter of public concern turns on "the content, form, and context ... as revealed by the whole record." *Connick*, 461 U.S. at 147-48 & n.7; *accord, e.g.*, *Durham*, 737 F.3d at 300.  Generally, speech "'involves a matter of public concern when it involves an issue of social, political, or other interest to a community.'" *Durham*, 737 F.3d at

300 (quoting *Kirby v. City of Elizabeth City,* 388 F.3d 440, 446 (4th Cir. 2004)).  "For purposes of this inquiry, it does not matter how interesting or important the subject of an employee's speech is, and the place where the speech occurs is also irrelevant." *Adams,* 640 F.3d at 564-65.

With respect to the second prong, *i.e.,* whether the employee's interest in speaking on a matter of public concern outweighed the government's interest in managing the work environment, a court must "balance the First Amendment interest of the employee against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Guarnieri,* 131 S. Ct. at 2493 (quoting *Pickering,* 391 U.S. at 568).  Thus, a court "must consider the context in which the speech was made, including the employee's role and the extent to which the speech impairs the efficiency of the workplace." *Bland v. Roberts,* 730 F.3d 368, 374 (4th Cir. 2013); *see Joyner v. Lancaster,* 815 F.2d 20, 23 (4th Cir. 1987).  An employee "who has a confidential, policymaking, or public contact role and speaks out in a manner that interferes with or undermines the operation of the agency, its mission, or its public confidence, enjoys substantially less First Amendment protection than does a lower level employee." *McVey v. Stacy,* 157 F.3d 271, 278 (4th Cir. 1998).  But, a "'stronger showing'" of government interests "'may be necessary if the employee's speech … substantially involve[s] matters of public concern.'" *Lane,* 134 S. Ct. at 2380 (quoting *Connick,* 461 U.S. at 152).

 In *Ridpath v. Board of Governors Marshall University,* 447 F.3d 292, 317 (4th Cir. 2006), the Fourth Circuit identified factors to guide this analysis, as follows:

> whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; (6) undermined the mission of the

institution; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the institution; and (9) abused the authority and public accountability that the employee's role entailed.

When a public employee's "discharge" is premised on the employee's "political beliefs and affiliation," the balancing test set forth above does not necessarily apply.  *See Bland*, 730 F.3d at 374.  Rather, under the so-called *Elrod-Branti* doctrine, discussed *infra*, the Supreme Court has identified a narrow exception to the Free Speech Clause's general protection of employees' rights, by which employees in policy making positions are subject to dismissal based on political affiliation.  *See Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980).

In *Elrod*, 427 U.S. at 373, a plurality of the Supreme Court found that "the practice of patronage dismissals is unconstitutional under the First and Fourteenth Amendments." Similarly, in *Branti*, 445 U.S. at 516-17, the Court recognized, generally, that "the First Amendment prohibits the dismissal of a public employee solely because of his private political beliefs."  Therefore, "public employees who allege that they were discharged . . . solely because of their partisan political affiliation or nonaffiliation state a claim for deprivation of constitutional rights secured by the First and Fourteenth Amendments."  *Elrod*, 427 U.S. at 349.

The defendant in *Elrod* was a newly elected Democratic sheriff who discharged several Republican employees of the Sheriff's Office "solely because they did not support and were not members of the Democratic Party . . . ."  427 U.S. at 359-51.  One of the discharged employees was "Chief Deputy of the Process Division and supervised all departments of the Sheriff's Office" at a certain location; another employee was a courthouse "bailiff and security guard"; a third employee was a process server in the office.  *Id.*  On First Amendment grounds, the

employees sued in federal court to enjoin their termination.   A plurality of justices of the Supreme Court held that the district court should have granted the injunction.   *See id.* at 373.

A  three-justice  plurality  opined  that  "the  practice  of  patronage  dismissals  is unconstitutional" because "any contribution of patronage dismissals to the democratic process does not suffice to override their severe encroachment on the First Amendment freedoms."  *Id.* at 373.   Two concurring justices articulated an exception to that general principle, viewing the case as presenting only a "single substantive question": "whether a *nonpolicymaking, nonconfidential* government  employee  can  be  discharged  or  threatened  with  discharge  from  a  job  that  he  is satisfactorily performing upon the sole ground of his political beliefs."  *Id.* at 375 (Stewart, J., concurring) (emphasis added).   The concurring justices "agree[d] with the plurality" that such an employee could not be dismissed on the basis of political affiliation.  *Id.*

Four  years  later,  in  *Branti*,  445  U.S.  507,  a  majority  of  the  Court  reaffirmed  *Elrod's* holding, in the context of the imminent firing of two Republican assistant public defenders by a Democratic public defender.  *See id.* at 508-09.   In so doing, the *Branti* Court reformulated the *Elrod* concurrence's exception to the prohibition of dismissal on the basis of political affiliation for "policymaking" or "confidential" employees.   The *Branti* Court said:  "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement  for  the  effective  performance  of  the  public  office  involved."   *Id.* at 518.[8]   It concluded that the assistant public defenders did not fall into the exception to the general rule

_____

[8]   The Supreme Court's formulation of the doctrine puts the onus on the employer to establish that a particular employee comes within the exception to the rule barring discharge of a public employee based on political affiliation.  445 U.S. at 518.

barring termination on the basis of political affiliation, even though, in some respects, they were involved in policymaking or privy to confidential information. *Id.* at 519-20.

Thus, with respect to the discharge of a public employee for political reasons, the court must consider "whether 'the [plaintiff's] position involve[s] government decisionmaking on issues where there is room for political disagreement on goals or their implementation.'" *Bland*, 730 F.3d at 375 (quoting *Stott v. Haworth*, 916 F.2d 134, 141 (4th Cir. 1990)) (alterations in *Bland*). "If it does," then the court must "'examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation [or political allegiance] is an equally appropriate requirement," *id.* (quoting *id.* at 142), and for whom the general protections of the First Amendment may not apply.

Notably, the *Elrod-Branti* doctrine is not limited to discharge or termination of employment. The Supreme Court has also held that the *Elrod-Branti* doctrine applies where a government employer bases "promotion, transfer, recall and hiring decisions … on party affiliation and support … ." *Rutan*, *supra*, 497 U.S. at 79. But, the Court has not spoken to the doctrine's applicability to actions other than termination, promotion, transfer, recall and hiring.

Here, in the light most favorable to Claridy, her Complaint alleges multiple violations of her right to free speech, including the filing of the First and Second Charges against her, as well as her change in job duties. Defendant presents a number of arguments against the sufficiency of Claridy's Complaint, none of which are persuasive.

Sheriff Anderson argues that Claridy failed to state a claim because, at all relevant times, she was speaking as a Lieutenant, *i.e.*, "as an agency official," in her own self-interest, rather

than as a private citizen on a matter of public concern.  *See* ECF 17 at 5.  He asserts that Claridy "'acknowledged that [she was] a Lieutenant employed with the Baltimore City Sheriff's Office'" while speaking as a candidate on a local radio show.  *Id.* at 7 (quoting First Charges, ECF 1-2 at 8-13).  To be sure, Claridy was employed as a Lieutenant with the Baltimore City Sheriff's Office.  But, even assuming Claridy publicly acknowledged during the campaign that she was employed with the Sheriff's Office, that does not mean Claridy was speaking "as an agency official" or, in other words, as an employee.  Moreover, she was not barred from running for office.

Anderson does not argue that Claridy appeared on the local radio show "pursuant to her official duties."  *See Garcetti*, 547 U.S. at 422.  Indeed, Claridy was on leave from the Sheriff's Office at the time.  *See* ECF 1 ¶ 14; ECF 1-2 at 8-13.  And, under the circumstances, no listener would be confused about whether Claridy, appearing as a candidate running *against* Anderson, was speaking as a citizen or as one of Anderson's employees.  *Compare Hinshaw v. Smith*, 436 F.3d 997, 1001, 1007-08 (8th Cir. 2006) (holding discipline of public employee did not violate Free Speech Clause where employee represented to State governor that she was speaking on behalf of employer, while she was suspended).

The bare fact that Claridy publicly revealed her employment with the Sheriff's Office, or even that she relied on it as a basis for offering her personal opinion, is not dispositive.  In *Pickering*, *supra*, 391 U.S. at 572, 576, for example, it was of no import to the Court's decision that, in the plaintiff's letter-to-the-editor, critical of the local school board, the plaintiff identified himself as a "teach[er] at the high school," and discussed his own experience there.  *See id*. ("Letters by your Board and Administration have stated that teachers' salaries total $1,297,746

for one year.  Now that must have been the total payroll, otherwise the teachers would be getting $10,000 a year.  I teach at the high school and I know this just isn't the case.  However, this shows their 'stop at nothing' attitude.").[9]

Further, in *Lane*, *supra*, 134 S. Ct. at 2379,  the Supreme Court made clear that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech."   Relying on *Garcetti*, *supra*, 547 U.S. 410, the *Lane* Court indicated that the "critical question" was "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."  *Lane*, 134 S. Ct. at 2379.   Thus, in *Lane* the Court held that plaintiff's testimony at the trial of a co-worker, which pertained to things plaintiff "learned … in the course of his employment," was not speech expressed "as an employee."  *Id.*

Under *Pickering* and *Lane*, it is clear that the Complaint alleges that Claridy was speaking "as a citizen" at all relevant times.   Moreover, defendant cannot seriously challenge Claridy's assertion that the speech at issue involved matters of public concern.  *See* ECF 17.

In referring to the topics of plaintiff's campaign, *id.* at 6, defendant also asserts:  "[T]his court may find that she did not speak as a citizen on matters of public concern.  Rather, she spoke as a Deputy Sheriff Lieutenant who was running for office."  *Id.* at 7.  He adds: "Claridy spoke to benefit herself and her campaign for Sheriff," *id.* at 8, and her allegations of "wrongdoing and corruption" amounted to speech that "undermined" the "mission" of the Sheriff's Office.  *Id.*

_____

[9] Pickering's letter is reproduced as an Appendix to the Court's opinion.  The quote I rely on here is taken directly from Pickering's letter in the Appendix.

It is readily apparent that Claridy's campaign speech addressed important matters of public concern.  As indicated, she campaigned on issues such as minority hiring, overtime abuse, the need to update technology, and the like.  Anderson does not point to any facts or cases that would lead to any other conclusion.   And, all reasonable persons would understand that campaign statements are in part self-interested, as defendant argues, ECF 17 at 8, but also, at the same time, of public concern, because they relate to the policy positions of a person who may soon be in charge of setting those policies.  That is to say, the personal, policy opinions of political candidates are always a matter of great public interest, despite the infusion of self-interest.  *See*, *e.g.*, *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 675-76 (1998) (quoting *CBS, Inc. v. FCC*, 453 U.S. 367, 396 (1981)) ("'[I]t is of particular importance that candidates have the ... opportunity to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day.'").

As to this issue, it is not a close call.  *Compare*, *e.g.*, *Guarnieri*, *supra*, 315 S. Ct. 2501 ("The forum in which a petition is lodged will be relevant to the determination of whether the petition relates to a matter of public concern.  A petition filed with an employer using an internal grievance procedure in many cases will not seek to communicate to the public or to advance a political or social point of view beyond the employment context."); *Andrew v. Clark*, 561 F.3d 261, 268 (4th Cir. 2009) (stating question of whether police officer's memorandum regarding police mishandling of a barricade situation is a matter of public concern could not be determined from Complaint).

Defendant also argues that, even if Claridy were speaking as a citizen, and on a matter of public concern, "the Sheriff's Office's interests outweigh Claridy's." *Id.* at 7. He asserts: "The court may rule as a matter of law that the Sheriff's Office (and Anderson) had a greater interest in protecting the agency from Claridy's allegations than Claridy had, in her own campaign speech." *Id.* I cannot agree.

The Complaint alleges no disruption inside the Sheriff's Office whatsoever, or any other effect on plaintiff's work there or on the work of other employees, before or after Claridy took leave. *See* ECF 1 ¶¶ 11, 12, 30. Indeed, Claridy alleges that, while she was campaigning and still working at the Sheriff's Office, her "job performance continued to be satisfactory" and "no disciplinary charges were filed against her." *Id.* ¶ 12. The charges filed against Claridy upon her return also lack any specific allegation of disruption. *See* ECF 1-2. Claridy further alleges that "no confidential information was disclosed … in her expressions." ECF 1 ¶ 29. Thus, on the face of the Complaint, many of the *Ridpath* factors that relate to workplace disruption favor Claridy. *See* 447 F.3d at 317 (directing courts to consider, *inter alia*, "whether a public employee's speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee's duties; (5) interfered with the operation of the institution; … (8) conflicted with the responsibilities of the employee within the institution …"); *see also Lane*, 134 S. Ct. at 2381 ("Respondents do not assert, and cannot demonstrate, any government interest that tips the balance in their favor. There is no evidence, for example, that [plaintiff's] testimony at [the] trials [at issue] was false or erroneous or that [plaintiff] unnecessarily disclosed any sensitive, confidential, or privileged information while testifying.").

Moreover, to the extent that Claridy's speech may have generally "undermined the mission of the institution" or "abused the authority and public accountability that the employee's role entailed," *Ridpath*, 447 F.3d at 317, *see also* ECF 17 at 8-9, the same argument would apply whenever an incumbent is challenged by a colleague in an electoral campaign.   Surely this argument could not justify the abridgment of a candidate's speech.   *See Republican Party of Minnesota v. White*, 536 U.S. 765, 794-95 (2002) (O'Connor, J., concurring) ("The State of Minnesota no doubt was concerned, as many citizens and thoughtful commentators are concerned, that judicial campaigns in an age of frenetic fundraising and mass media may foster disrespect for the legal system.   Indeed, from the beginning there have been those who believed that the rough-and-tumble of politics would bring our governmental institutions into ill repute. And some have sought to cure this tendency with governmental restrictions on political speech. *See* Sedition Act of 1798, ch. 74, 1 Stat. 596. Cooler heads have always recognized, however, that these measures abridge the freedom of speech—not because the state interest is insufficiently compelling, but simply because content-based restrictions on political speech are 'expressly and positively forbidden by' the First Amendment.   *See New York Times Co. v. Sullivan*, 376 U.S. 254, 274 (1964) (quoting the Virginia Resolutions of 1798)").

In any event, Claridy's interest in the speech—and the public's interest in hearing her views—outweighed Anderson's interest in managing the workplace environment.   As discussed, *supra*, defendant insists that Claridy's speech was "made primarily, if not solely, to advance her campaign for Sheriff."   ECF 17 at 8 (citation and alteration omitted).   Defendant fails to recognize that the "interest at stake is as much the public's interest in receiving informed opinion

as it is the employee's own right to disseminate it.'"  *See Lane*, 134 S. Ct. at 2377 (quoting *San Diego*, *supra*, 543 U.S. at 82).

An employee with a "confidential, policymaking, or public contact role … enjoys substantially less First Amendment protection than does a lower level employee." *McVey*, 157 F.3d at 278; *see also Rankin v. McPherson*, 483 U.S. 378, 390 (1987) ("The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails."); ECF 17 at 7.  But, as discussed, *supra*, according to the Complaint, when Claridy engaged in the speech at issue she was speaking as a candidate for elected office, running against Anderson.  In this context, Claridy's personal policy opinions were a matter of great public concern.  This tips the balance very heavily in her favor, even if she had a confidential, policymaking, or public contact role, and nothing alleged in the Complaint persuades me that Anderson's interest outweighed the public's interest.  *See*, *e.g.*, ECF 1 ¶ 29 ("No confidential information was disclosed by Claridy in her expressions.").

On balance, therefore, I find that plaintiff's Complaint plausibly alleges that her interest, and the public's interest, in her campaign speech outweighed defendant's interest in "promoting the efficiency of the public services [he] performs."  *See Pickering*, 391 U.S. at 568.

Alternatively, defendant argues that Claridy's "reassignment and administrative discipline were permissible" under the "*Elrod-Branti* exception to the patronage dismissal rule." ECF 17 at 9.  As discussed below, this argument is unpersuasive for several reasons.

First, even assuming Claridy was performing a policymaking role prior to September 2010, the *Elrod-Branti* exception does not apply to the issuance of misconduct charges.  To be sure, Anderson's decision to change Claridy's job duties after she ran against him fits well within

the rationale of the exception—if Claridy was a policymaker, then Anderson was within his rights to take away those duties after Claridy declared her opposition to his policies and he won the election.   Anderson's decision to change Claridy's duties arguably "served the important government goal of assuring 'the implementation of policies of [a] new administration, policies presumably sanctioned by the electorate.'"  *See Bland*, 730 F.3d at 374-75 (quoting *Elrod*, 427 U.S. at 367) (alteration in *Bland*) (additional citation omitted).   The misconduct charges, however, do not serve this same end; they do not effect a change in power over policy decisions. Rather, the charges are nakedly punitive.[10]

Put another way, any decision that removes job duties that appropriately require political loyalty from someone who is not politically loyal—by, for example, terminating or transferring that individual, or simply assigning different duties—fits within the rationale of the doctrine.  *See Rutan*, 497 U.S. at 79.  Similarly, any decision that denies a person who is not politically loyal the opportunity to perform duties that appropriately require political loyalty— by, for example,

---

[10] As discussed, *infra*, Anderson may have reasonably believed that he could fire someone in Claridy's position because of her political speech and affiliation.   For the same reason, Anderson may have reasonably believed that he could also choose to administratively charge Claridy with misconduct instead.   But, with regard to Constitutional protection of individual rights, the Supreme Court long ago rejected the idea that the greater power necessarily includes the lesser.  *See, e.g., Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996) (citation omitted) (noting that Supreme Court precedent has "long since rejected Justice Holmes' famous dictum, that a policeman 'may have a constitutional right to talk politics, but he has no constitutional right to be a policeman'"); *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (citation omitted) ("For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely."); *accord Elrod*, 427 U.S. at 360-62; *see also Rankin*, 483 U.S. at 383-84 ("Even though McPherson was merely a probationary employee, and even if she could have been discharged for any reason or for no reason at all, she may nonetheless be entitled to reinstatement if she was discharged for exercising her constitutional right to freedom of expression.").

not hiring or reappointing that person, not recalling that person from layoff, or by denying that person a promotion to a job with such duties— also fits within the rationale of the doctrine.  *Id.*  However, any action taken against a public employee because of her political speech or affiliation that does not necessarily involve a change in an individual's job duties— such as the filing of misconduct charges— does not fit within the rationale of the doctrine.  A misconduct charge does not replace a politically "disloyal" person with a loyal one, and, therefore, does not serve to implement the electorate's will in the same way that discharge of "disloyal" employees does.  *See Elrod*, 427 U.S. at 367.  A misconduct charge simply communicates a judgment that the public employee has done something *wrong*.

Second, even assuming the *Elrod-Branti* exception applies to Anderson's decision to alter Claridy's job duties, *see Rutan*, 497 U.S. at 79 (applying doctrine to "transfers"), at this stage, it would be premature to decide whether Claridy's position as a Lieutenant "resemble[d] a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation or political allegiance is an equally appropriate requirement."  *See Stott*, 916 F.2d at 141 (alteration added).  The Fourth Circuit has unambiguously stated that courts must "consider whether requiring political loyalty was an appropriate requirement for the effective performance of the public employment of the deputies . . . *in light of the duties of their particular positions*."  *Bland*, 730 F.3d at 377 (emphasis in original).  There is simply not enough information in the Complaint to definitively determine this fact-dependent question.

On this point, Anderson devotes six pages of his Memo to his argument that his actions were justified under the *Elrod-Branti* exception.  Yet, he cites the Complaint only once.  ECF 17

at 13 (citing ECF 1 ¶ 9).  He states that Claridy was, "by her own admission, the top ranking female deputy, and reported directly to the agency's second-in-command."  *See id.*  Instead of citing the Complaint, Anderson relies largely on matters outside the pleadings, *i.e.*, a job description for the position of "Deputy Sheriff Lieutenant" that he submitted with his Motion. *See* ECF 17 at 12-13; ECF 17-2.[11]

Claridy's high rank within the Sheriff's Office, *see* ECF 1 ¶ 9, is certainly a strong indication that political loyalty would be an appropriate job requirement for her position.  And, the fact that Claridy could exercise the power of arrest, ECF 1 ¶ 9, is noteworthy.  *See Knight v. Vernon*, 214 F.3d 544, 545 (2000) (highlighting plaintiff's lack of arrest power in holding political affiliation was not an appropriate requirement for her position).  But, it is not dispositive.  *See Bland*, 730 F.3d at 379 (finding that plaintiffs' "technical authorization to make arrests had no appreciable effect whatsoever on the job duties of their position" and holding political affiliation was not an appropriate requirement for their position).  Generally, Claridy alleges that her job duties were "primarily … administrative … ."  ECF 1 ¶ 9.

I cannot determine, on the basis of the allegations, what, if any, discretion Claridy exercised.  In any event, I need not decide whether Claridy's position appropriately included political affiliation or loyalty as a job requirement because, as discussed, *infra*, Anderson is entitled to qualified immunity.  This immunity bars any monetary relief.  And, in light of Claridy's termination on other grounds, subsequent to the filing of her Complaint, it is clear that

---

[11] I cannot consider matters outside the pleadings without converting the Motion to a motion for summary judgment.  *See Clatterbuck*, 708 F.3d at 557; *Philips*, 572 F.3d at 180; *see also* Fed. R. Civ. P. 12(d).  Defendant has not asked me to do that.  *See* ECF 17.  And, although it is within the Court's discretion to convert the Motion, *see, e.g.*, 5C Wright & Miller, FED. PRAC. & PRO. § 1366, at 159 (3d ed. 2004, 2011 Supp.), it is not appropriate to do so at this time, because, as discussed *infra*, I need not rule on the nature of Claridy's position.

her requests for injunctive relief that relate to Anderson's decision to change her duties are now moot. *See* ECF 1 at 10-11 (requesting "injunctive relief restoring Plaintiff to her full time duties as a sworn deputy sheriff" and "restoring her police powers"). Consequently, only plaintiff's claims for injunctive relief with respect to the administrative misconduct charges filed against her will survive my conclusion that Anderson is entitled to qualified immunity.

Further, defendant argues, alternatively, that even if Claridy spoke as a citizen on a matter of public concern, and even if her (and the public's) interest in the speech outweighed his, Claridy still fails to allege a claim for relief because she cannot show that her speech caused Anderson to take the actions at issue. ECF 17 at 15. Rather, he contends that plaintiff's "reassignment and administrative charges were the result of her violations of agency policy." *Id.* According to Anderson, Claridy "was disciplined because of poor job performance, the misuse of her agency uniform in campaign literature, and her defamatory remarks about the Sheriff engaging in corruption," not for her protected speech. *Id.* at 16.

Anderson cannot deny a clear chain of cause-and-effect by attempting to re-label, in name only, the "cause" of his actions. Asserting that Claridy's "misconduct" caused Anderson's actions does not change the fact that Claridy's campaign speech was the "misconduct" at issue in eleven of the seventeen charges. Thus, it is clear that Anderson charged plaintiff with misconduct, at least in part, based expressly on what she said, *i.e.*, her alleged "defamatory remarks about the Sheriff." *See* ECF 17 at 16; *see also*, *e.g.*, First Charges, ECF 1-2 at 8 (charging Claridy with violation of Standard of Conduct prohibiting "public criticism of" the Office/agency during campaign appearance on a local radio show in August 2010). It is true that some of the charges relate to alleged job performance issues unrelated to Claridy's campaign

speech.  *See*, *e.g.*, *id.* at 15 (charging Claridy with failing to submit complete sets of daily reports); *see also* ECF 1 ¶¶ 18, 20.  But, given that these charges were filed, the first time, simultaneously with charges expressly based on plaintiff's speech, and, in light of the totality of the circumstances discussed, *supra*, it is plausible that these charges were also levelled in retaliation for Claridy's speech.

In sum, I find that Claridy's Complaint plausibly alleges a claim for relief for violations of her right to free speech.

### B. Qualified Immunity

Notwithstanding any violations of Claridy's right to free speech, Anderson contends that he is protected by the doctrine of qualified immunity.

A government official, such as Anderson, "who is sued in his individual capacity," as is Anderson, "may invoke qualified immunity" to bar a claim for civil damages under 42 U.S.C. § 1983.  *Bland*, 730 F.3d at 391; *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The defense does not apply to claims for injunctive relief, however.  *See Pearson v. Callahan*, 555 U.S. 223, 242-43 (2009) (affirming that defendants may not seek qualified immunity "in cases in which that defense is not available, such as … § 1983 cases against individuals where injunctive relief is sought instead of or in addition to damages"); *Lefemine v. Wideman*, 672 F.3d 292, 303-04 (4th Cir.) ("Claims for declaratory and injunctive relief are not affected by qualified immunity."), *rev'd on other grounds*, ––– U.S. ––––, 133 S. Ct. 9 (2012) (reversing holding that plaintiff was not entitled to attorney's fees); *accord Vollette v. Watson*, 937 F. Supp. 2d 706, 720 (E.D. Va. 2013).

"Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231 (citation omitted).   "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, ⸺ U.S. ⸺, 134 S. Ct. 3, at *5 (2013) (Westlaw).   Moreover, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 555 U.S. at 231.

Specifically, the doctrine "protects police officers and public officials from claims of constitutional violations 'for reasonable mistakes as to the legality of their actions.'" *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir.) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)), *cert. denied*, ⸺ U.S. ⸺, 133 S. Ct. 789 (2012).   Qualified immunity shields government officers from liability for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818.   Because qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law," *Harlow*, *id.*, an officer who makes an honest but objectively unreasonable mistake is not protected by qualified immunity.

"A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, ⸺ U.S. ⸺, 135 S. Ct. 348, 350 (2014) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

"In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al–Kidd,* 563 U.S. ——, 131 S. Ct. 2074, 2080 (2011)); *see also Reichle v. Howards,* —— U.S. ——, 132 S. Ct. 2088, 2093 (2012). "'[T]he existing authority must be such that the unlawfulness of the conduct is manifest.'" *Merchant,* 677 F.3d at 665 (quoting *Wilson v. Layne,* 141 F.3d 111, 114 (4th Cir. 1998)).

And, of import here, the issue is "assessed in light of the legal rules that were 'clearly established' at the time" of the disputed conduct. *Messerschmidt v. Millender,* —— U.S. ——, 132 S. Ct. 1235, 1245 (2012) (citation and some internal quotation marks omitted). Accordingly, we must consider the state of the law in 2011, when Sheriff Anderson disciplined plaintiff.

The qualified immunity analysis can be separated into two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a constitutional right," *Saucier,* 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case-that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'" *Merchant,* 677 F.3d at 662 (citation omitted) (alteration in *Merchant*). The "two inquiries . . . may be assessed in either sequence." *Id.* at 661-62.

As discussed, I have already found that Claridy's complaint plausibly alleges that Anderson violated her constitutional right to freedom of speech. But, for the reasons that follow, I find that it was not clearly established that the alleged conduct was unlawful in the situation that Anderson confronted. Three decisions of the Fourth Circuit undergird my conclusion.

First, in *Jenkins v. Medford,* 119 F.3d 1156, 1158, 1165 (1997) (en banc), *cert. denied,* 522 U.S. 1090 (1998), the Fourth Circuit determined that the Sheriff of Buncombe County,

North Carolina, did not violate the First Amendment rights of "several deputy sheriffs" when he dismissed them because they failed to support his election bid, supported other candidates, and failed "to associate themselves politically with [his] campaign." The Court applied the two-part test established in *Stott*, *supra*, 916 F.2d 134, described above, to determine whether the "particular responsibilities" of the deputies' positions appropriately included political party affiliation as a requirement for effective job performance. *Jenkins*, 119 F.3d at 1162.

In so doing, the Court relied on descriptions of the position of "deputy sheriff" found in the North Carolina General Statutes. *Id*. at 1163-64. It pointed out that, under North Carolina law, deputy sheriffs act "'in the name of and with the powers coterminous with his principal, the elected sheriff,'" *id.* at 1163 (quoting N.C. Gen. Stat. § 17E-1); that they were appointed and were at-will employees, *see id.* at 1163; and that the Sheriff could be held liable for their misbehavior. *Id*. However, in closing, the Court more broadly stated that its holding was limited "to those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff." *Id*. at 1165. The Court also described such persons as "law enforcement officers." *Id*.

In dissent, four Judges argued that the majority opinion effected "a blanket pronouncement that *all* North Carolina deputies, regardless of actual job duties, are policymaking employees … ." *Id*. at 1169 (Motz, J., dissenting). The majority countered, in a footnote, that the "dissent manifests a misunderstanding of [the] holding." *Id*. at 1165 n.66. It continued to state that the majority's holding "applies only to those [deputies] who meet the requirements of the rule as we state it, and does not extend to all 13,600 officers in North Carolina, as the dissent suggests." *Id*.

Three years later, in *Knight v. Vernon*, 214 F.3d 544, 545 (4th Cir. 2000), the Court reversed the award of summary judgment in favor of the Sheriff of Rockingham County, North Carolina, on finding that "political allegiance is not an appropriate job requirement for a jailer," such as the plaintiff, Kathy Knight.   After reviewing its prior analysis in *Jenkins*, the Court emphasized that *Jenkins*'s "central message … is that the specific duties of the public employee's position govern whether political allegiance to her employer is an appropriate job requirement." *Id.* at 549.   It then went on to consider Knight's specific job duties, noting that "she had the lowest level position in the county jail"; her "contact with the public was limited"; she was not a "deputy sheriff," *i.e.* a "sworn law enforcement officer," and did not have "the general power of arrest"; she was not "out in the county engaging in law enforcement activities," was not a "confidant," and "did not advise [the Sheriff] on policy matters"; in short, "she was not entrusted with broad discretion," and "the sheriff did not rely on her for assistance in implementing his law enforcement platform." *Id.* at 550.   The Court then "reversed the district court's decision that Ms. Knight could be fired because of her politics." *Id.*

More recently, in *Bland*, *supra*, 730 F.3d at 371-72, the Fourth Circuit was asked to decide, *inter alia*, whether the Sheriff of the City of Hampton, Virginia, was entitled to qualified immunity for his decision not to reappoint certain "sworn deputy sheriffs" who supported his electoral opponent.   The "sworn deputies" in issue worked as jailers. *Id.* at 372.   The Court determined that their job duties were "essentially identical to those of the plaintiff" in *Knight*. *Id.* at 378.   But, unlike the plaintiff in *Knight*, the deputies in *Bland* were "sworn" officers who took an oath, and they had "general arrest powers." *Id.* at 379.   Because the oath was not "a law enforcement officer's oath," like that of the plaintiffs in *Jenkins*, and because the plaintiffs'

"technical authorization to make arrests had no appreciable effect whatsoever on the job duties of their position," the Court concluded that the Sheriff was not entitled to summary judgment on the claim "that the jailers' arrest duties were sufficiently significant" such that "they would affect whether their political allegiance to the Sheriff was an appropriate requirement for the effective performance of their jobs." *Id.*

Nonetheless, the Court held that the Sheriff was entitled to qualified immunity.[12]  Chief Judge Traxler, writing for the panel majority, reasoned as follows, *id.* at 391-93 (citations omitted) (emphasis in original):

> Simply put, *Jenkins* sent very mixed signals.  Although we conclude today for the reasons discussed earlier that *Jenkins* is best read as analyzing the duties of the particular deputies before the court, much of the opinion's language seemed to indicate that a North Carolina sheriff could terminate his deputies for political reasons regardless of the duties of their particular positions. ...
>
> ***
>
> As if this language were not already strong support for a broader reading of *Jenkins*, as we have pointed out, the dissent in *Jenkins* read it that way as well, accusing the majority of "hold[ing] that *all* deputy sheriffs in North Carolina— regardless of their actual duties—are policymaking officials."
>
> ***
>
> Additionally, *Knight v. Vernon*, while important to our decision regarding the *merits* of [the plaintiffs'] constitutional claims, did not *clearly establish* that the broader reading of *Jenkins* was incorrect.  Although Knight worked in a sheriff's office, she was not a deputy.
>
> ***
>
> For the reasons stated previously, we believe we have sent mixed signals as to when a sheriff could fire a deputy for political reasons and we have been unclear as to when he could and when he could not.

---

[12] I sat as a visiting judge in *Bland*, and dissented as to the finding of qualified immunity. *Bland*, 730 F.3d at 395-402 (Hollander, J., dissenting).

- 38 -

Thus, the Court held that the Sheriff in that case was entitled to qualified immunity.  *See Bland*, 730 F.3d at 371.

Here, like the plaintiffs in *Jenkins*, and unlike the plaintiff in *Knight*, Claridy held the title of "Deputy Sheriff."  *See* Complaint, ECF 1 ¶ 9.  She was a "sworn" "law enforcement officer," and she had the power of arrest.  *Id.*  Moreover, as a Lieutenant, Claridy held a higher rank than the plaintiffs in *Jenkins*.  *Id.* ¶ 8.  Although it is not clear whether Claridy's position included political affiliation or loyalty as a job requirement, it is clear, based on plaintiff's allegations, that Anderson is entitled to qualified immunity under *Bland*.

As noted, plaintiff was charged initially in May 2011, and again in September 2011, with violations of agency policy as a result of her campaign in September 2010 to unseat Anderson.  ECF 1 ¶¶ 16, 18, 20, 21.  *Bland* was not decided until September 2013, however.  Certainly, from that point forward, any ambiguity in *Jenkins* and *Knight* has been resolved; the law is now clearly established that Sheriffs must carefully evaluate the job duties of their deputy sheriffs in order to determine whether the *Elrod-Branti* exception applies.  But, *Bland* determined that, as of 2013, the law was not clearly established.  Thus, when Anderson made the decisions to discipline Claridy and to transfer her duties, he did so under the ambiguous directives of *Jenkins* and *Knight*.  *Id.*  Because Claridy alleges that she served as a "sworn deputy sheriff" with "duties as a law enforcement officer including courtroom security, service of process and making arrests," ECF 1 ¶ 9, the Complaint alleges sufficient facts to find that a reasonable official could have believed that Claridy's job description was analogous to that of the plaintiffs in *Jenkins*, and, therefore, political affiliation or loyalty was an appropriate job requirement.

Indeed, in *Bland* the Fourth Circuit held that the defendant was entitled to qualified immunity despite the fact that the plaintiffs there had duties "essentially identical to those of the plaintiff" in *Knight*, *i.e.*, jailer, 370 F.3d at 378.   Here, in contrast, Claridy's high rank, as a Lieutenant with supervisory responsibility who reported to "the second in command of the office", makes it even more likely that her position fit within the *Elrod-Branti* exception than the lower-level positions of the *Jenkins* plaintiffs.   *See*, *e.g.*, *Knight*, 214 F.3d at 545 (highlighting that Knight had "lowest level position in county jail" in support of conclusion that the "sheriff did not rely on her for assistance in implementing his law enforcement platform").

Anderson's actions in this case are different from those at issue in *Jenkins*, *Knight*, and *Bland*, however.   As discussed, in each of those cases, the plaintiffs alleged retaliation when defendants fired them or chose not to reappoint them because of their political speech or affiliation.   Claridy's Complaint does not allege that Anderson fired her or did not reappoint her; rather, she alleges a change in duties and two instances of discipline, *i.e.*, the First and Second Charges, which also resulted in suspension of her "police powers" and, for a time, suspension from her job, albeit with pay.   ECF 1 ¶¶ 16, 18, 20, 21; ECF 1-2.   However, as discussed, Anderson's decision to change Claridy's job duties, and, arguably, his suspension of her police powers, fits well within the rationale of the *Elrod-Branti* exception.   And, it is supported by the Supreme Court's opinion in *Rutan*, *supra*, 497 U.S. at 79, which held the *Elrod-Branti* doctrine applies to decisions regarding promotions, transfers, recalls, and hiring.

As also discussed, however, I do not believe the *Elrod-Branti* exception applies to Anderson's decisions to charge Claridy administratively with misconduct.   But, I cannot say that existing precedent has "placed the statutory or constitutional question beyond debate."   *See*

- 40 -

*Ashcroft*, *supra*, 131 S. Ct. at 2080.  To my knowledge, neither the Supreme Court nor the Fourth Circuit has addressed the issue, nor is there "a general constitutional rule already identified" that applies "with obvious clarity to the specific conduct in question … ."  *United States v. Lanier*, 520 U.S. 259, 271 (1997); *see also McDowell*, *supra*, 2000 WL 1481432, at *4 (holding defendant-sheriff was entitled to qualified immunity for his decision to discipline plaintiff, a "deputy sheriff," based on plaintiff's opposition, in union vote and before media, to sheriff's policy decision, although sheriff violated plaintiff's right to free speech).  Because, as discussed, *Jenkins* seemed to say that a Sheriff could *fire* someone with Claridy's position because of her political speech and affiliation, Anderson may have reasonably believed that he could also choose instead to administratively charge Claridy with misconduct.

Accordingly, for the foregoing reasons, Anderson is entitled to qualified immunity with respect to all of Claridy's claims for monetary damages.  Those claims will therefore be dismissed, leaving only Claridy's claims for injunctive relief to be decided.  *See* ECF 1 at 10-11.

### Conclusion

For the foregoing reasons, I will GRANT the Motion, in part, and dismiss all of plaintiff's claims for monetary damages, with prejudice.  However, I will DENY the Motion, in part, because plaintiff's Complaint states a claim for injunctive relief.

A separate Order follows, consistent with this Memorandum.


Date: March 9, 2015                              _____/s/_____
                                                 Ellen Lipton Hollander
                                                 United States District Judge